Michael Robinson-Dorn (CA Bar 159507)
UC Irvine School of Law
Environmental Law Clinic
401 E. Peltason Dr.
P.O. Box 5479
Irvine, CA 92612-5479
(949) 824-1043
mrobinson-dorn@law.uci.edu

*Attorney for Plaintiffs*
Inland Empire Waterkeeper and Orange County Coastkeeper

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INLAND EMPIRE WATERKEEPER, a program of ORANGE COUNTY COASTKEEPER; ORANGE COUNTY COASTKEEPER, a California non-profit corporation;<br><br>        Plaintiffs,<br><br>v.<br><br>AMERICAN ARROW, LLC; MOHAMMAD R. TAHERIAN, DBA ALL TOYOT AUTO DISMANTLING; GEVORK ADZHINYAN, DBA EMPIRE AUTO DISMANTLING; and AMERICAN DISMANTLING, LLC,<br><br>        Defendants. | Case No.: 2:15-CV-04745<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, AND CIVIL PENALTIES**<br><br>**(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.)** |

Inland Empire Waterkeeper and Orange County Coastkeeper (collectively, "Waterkeeper"), by and through its counsel, hereby allege:

## I.   JURISDICTION, VENUE & NOTICE

1.      This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et. seq.* ("Clean Water Act" or "CWA"). *See* 33 U.S.C. § 1365. This Court has subject matter jurisdiction over the Parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. § 1331 (civil action arising under the laws of the United States) and 2201 (action for declaratory relief).

2.      Pursuant to the CWA's citizen suit provisions, on April 15, 2015, Waterkeeper provided the following parties with notice of the violations alleged in this Complaint and notice of Waterkeeper's intent to sue for their violations of the CWA: American Arrow, LLC ("American Arrow"); Mohammad R. Taherian, DBA All Toyot Auto Dismantling ("All Toyot"); Gevork Adzhinyan, DBA Empire Auto Dismantling ("Empire"); and American Dismantling, LLC ("American Dismantling") (collectively, "Defendants").  Waterkeeper provided that notice ("Notice Letter") via certified mail.  The Notice Letter was also sent to the registered agent for each of the Defendants pursuant to 40 C.F.R. § 135.2(a)(1). The Notice Letter was also sent to the Administrator of the United States Environmental Protection Agency (EPA), the Administrator of EPA Region IX, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the State Water Resources Control Board, Santa Ana Region ("Regional Board"), as required by the Clean Water Act. 40

C.F.R. § 135.2(a)(1). A true and correct copy of the Notice Letter is attached hereto as Exhibit 1, and is incorporated herein.

3.     More than sixty (60) days have passed since the Notice Letter was served on the Defendants and the State and Federal agencies.

4.     Waterkeeper is informed and believes, and thereon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting an action to redress the violations alleged in this Complaint. *See* 33 U.S.C. § 1365(b)(1)(B).

5.     This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g), and the violations complained of in the Notice Letter are continuing and/or reasonably likely to continue to occur.

6.     Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this judicial district.

## II.     INTRODUCTION

7.     This Complaint seeks relief for the Defendants' substantive and procedural violations of California's Permit for Discharges of Storm Water Associated with Industrial Activities (National Pollutant Discharge Elimination System General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ) ("Storm Water Permit").

8.     This Complaint specifically alleges that the Defendants' discharge of pollutants from their facilities and property into waters of the United States, the

Defendants' violations of the filing, monitoring, and reporting requirements, the Defendants' violation of the discharge and management practice requirements, and the Defendants' violations of other procedural and substantive requirements of the Storm Water Permit and the CWA are ongoing and continuous.

## III.   PARTIES

### A.   Inland Empire Waterkeeper and Orange County Coastkeeper

9.     Plaintiff Inland Empire Waterkeeper is a chapter of Orange County Coastkeeper. Inland Empire Waterkeeper's office is located at 6876 Indiana Avenue, Suite D, Riverside, California 92506.

10.     Plaintiff Orange County Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its office at 3151 Airway Avenue, Suite F-110, Costa Mesa, California 92626.

11.     Together, Inland Empire Waterkeeper and Orange County Coastkeeper (collectively, "Waterkeeper") have over 2,000 members who live and/or recreate in and around the Santa Ana River Watershed.

12.     Waterkeeper is dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of surface waters in Orange County and the Inland Empire.  To further these goals, Waterkeeper actively seeks federal and state agency implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

13.     Waterkeeper's members use and enjoy the Santa Ana River and its tributaries, Etiwanda/San Sevaine Channel, and the Pacific Ocean and its shoreline

(collectively, "Receiving Waters"), into which pollutants from the Defendants' ongoing illegal activities are discharged. Waterkeeper members enjoy the Pacific Ocean and its shoreline, into which contaminants from the Santa Ana River and Etiwanda/San Sevaine Channel flow.

14.   Waterkeeper's members use these waters and adjacent lands to fish, sail, boat, paddleboard, canoe, kayak, swim, surf, hike, view wildlife, and engage in scientific study including monitoring activities.

15.   Discharges of polluted storm water and non-storm water from the Defendants' facilities degrade water quality and harm aquatic life in the Receiving Waters and impair Waterkeeper's members' use and enjoyment of those waters.

16.   The violations of the Storm Water Permit and Clean Water Act at the Defendants' facilities and properties are ongoing and continuous. Thus, the interests of Waterkeeper's members have been, are being, and will continue to be, adversely affected by the Defendants' failure to comply with the Clean Water Act and the Storm Water Permit.

**B.    American Arrow**

17.   Waterkeeper is informed and believes, and thereon alleges, that American Arrow is the owner of properties upon which the Defendants operate, (hereafter, "the Property").

18.   Waterkeeper is informed and believes, and thereon alleges, that the Property Information Management System for the County of San Bernardino lists American Arrow as the sole owner of parcel 0232-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 at 8569 Beech Ave, and parcels 0232-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 and 0232-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 at 15303 Arrow Ave.

19.     Waterkeeper is informed and believes, and thereon alleges, that American Arrow is an active Limited Liability Company registered in California located at 15303 Arrow Boulevard, Fontana, California 92335.

20.     Waterkeeper is informed and believes, and thereon alleges, that American Arrow is an operator of American Dismantling.

### C.     All Toyot Auto Dismantling

21.     Waterkeeper is informed and believes, and thereon alleges, that Mohammad R. Taherian, an individual DBA All Toyot Auto Dismantling, is an active business registered in California located at 8569 Beech Ave. STE B, Fontana, California 92335-1261.

22.     Waterkeeper is informed and believes, and thereon alleges, that All Toyot operates automotive dismantling facilities at the Property.

### D.     Empire Auto Dismantling

23.     Waterkeeper is informed and believes, and thereon alleges, that Gevork Adzhinyan, an individual DBA Empire Auto Dismantling, is an active business registered in California located at 8569 Beech Ave. #C, Fontana, California 92335.

24.     Waterkeeper is informed and believes, and thereon alleges, that Empire operates automotive dismantling facilities at the Property.

### E.     American Dismantling

25.     Waterkeeper is informed and believes, and thereon alleges, that American Dismantling is an active Limited Liability Company registered in California located at 15303 Arrow Hwy, Fontana, California 92335.

26.     Waterkeeper is informed believes, and thereon alleges, that American Dismantling operates automotive dismantling facilities at the Property.

**IV.     LEGAL BACKGROUND AND AUTHORITY**

**A.     The Clean Water Act**

27.     Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit, issued pursuant to section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

28.     The Clean Water Act requires point source discharges of pollutants to navigable waters to obtain an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

29.     The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged," and includes facilities discharging storm water associated with industrial activity. 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

30.     The term "pollutant" is broadly defined and includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

31.     The "discharge of a pollutant" means, among other things, the addition of a pollutant to waterways of the United States from any "point source." *See* 40 C.F.R. § 122.2.

32.     "Waters of the United States" are defined as "navigable waters," and "all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7).

33.     The EPA has promulgated regulations defining "waters of the United States." *See* 40 C.F.R. §230.3. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to navigable waters, wetlands adjacent to navigable waters, and intermittent streams that could affect interstate commerce.

34.     The Clean Water Act confers jurisdiction over non-navigable waters that are tributary to traditionally navigable waters where the water at issue has a significant nexus to the navigable water. *See Rapanos v. United States*, 547 U.S. 715 (2006); *see also N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993 (9th Cir. 2007). A significant nexus is established if the "[receiving waters], either

alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters." *Rapanos*, 547 U.S. at 779; *N. Cal. River Watch*, 496 F.3d at 999-1000.

35.     A significant nexus is also established if waters that are tributary to navigable waters have flood control properties, including functions such as the reduction of flow, pollutant trapping, and nutrient recycling. *Rapanos*, 547 U.S. at 782; *N. Cal. River Watch*, 496 F.3d at 1000-1001.

36.     Storwater runoff which enters a tributary stream of a navigable waterway is considered a discharge into waters of the United States.

37.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved NPDES permit program for regulating the discharge of pollutants, including discharges of polluted storm water.

38.     Section 402(b) of the CWA, 33 U.S.C. § 1342(b), establishes a framework for regulating industrial storm water discharges under the NPDES program. Section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, who is alleged to be in violation of an "effluent standard or limitation... or an order issued by the Administrator or a State with respect to such a standard or limitation." *See* 33 U.S.C. §§ 1365(a)(i) and 1365(f).

39.     The term "person" means "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body." 33 U.S.C. § 1362(5).

40.     American Arrow is a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

41.     All Toyot Auto Dismantling is a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

42.     Empire Auto Dismantling is a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

43.     American Dismantling is a "person" within the meaning of Section 502(5) of the Clean Water Act. *See* 33 U.S.C. § 1362(5).

44.     An action for injunctive relief is authorized under Section 505(a) of the Clean Water Act. *See* 33 U.S.C. § 1365(a).

45.     Each separate violation of the Clean Water Act subjects the violator to a penalty of up to $37,500 per day for violations occurring after January 12, 2009. *See* 33 U.S.C. §§ 1319(d) and 1365(a); 40 C.F.R. § 19.4 (Adjustment of Civil Monetary Penalties for Inflation).

46.     Section 505(d) of the Clean Water Act allows prevailing or substantially prevailing parties to recover litigation costs, including attorney's fees, expert's fees, and consultant's fees. *See* 33 U.S.C. § 1365(d).

**B.     California Storm Water Permit**

47.     California's Storm Water Permit is a statewide general NPDES permit issued by the State Board pursuant to Section 402 of the Clean Water Act. *See* 33 U.S.C. § 1342(b); *see* 40 C.F.R. § 123.25. Section 402(b) of the Act authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual NPDES permits issued to dischargers and/or through

the issuance of a statewide general NPDES permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342.

48.     Pursuant to Section 402 of the CWA, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

49.     In California, the State Board is charged with regulating pollutants to protect California's water resources. *See* Cal. Water Code § 13001.

50.     In order to discharge storm water lawfully in California, industrial dischargers must secure coverage under the Storm Water Permit and comply with its terms, or obtain and comply with an individual NPDES permit.

51.     Prior to beginning industrial operations, industrial dischargers are required to apply for coverage under the Storm Water Permit by submitting a Notice of Intent ("NOI") to the State Board.

52.     Violations of the Storm Water Permit are also violations of the CWA.

**C.     Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations**

53.     Except as allowed by the Storm Water Permit, discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States is prohibited. *See* Storm Water Permit, Discharge Prohibitions A(1). Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit. *See id.*

54.     Discharge Prohibition A(2) of the Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges which cause or threaten to cause pollution, contamination, or nuisance.

55.     Effluent Limitation (B)(3) of the Storm Water Permit requires dischargers covered by the Storm Water Permit to reduce or prevent pollutants in storm water discharges through the implementation of Best Available Technology Economically Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, lead, zinc, iron, and aluminum, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biological oxygen demand, total suspended solids ("TSS"), oil and grease ("O&G"), and pH, among others.

56.     The EPA has published benchmarks for storm water pollutant concentrations in certain industrial categories ("EPA Benchmarks"). Discharge from an industrial facility containing pollutant concentrations that exceed the EPA Benchmarks indicates that the facility has not developed and/or implemented Best Management Practices ("BMPs") that meet BAT for toxic pollutants and/or BCT for conventional pollutants. Final Reissuance of National Pollutant Discharge Elimination System (NPDES) Storm Water Multi-Sector General Permit for Industrial Activities, 65 Fed. Reg. 64,746 (Oct. 30, 2000)("2000 MSGP Permit"); Final National Pollutant Discharge Elimination System (NPDES) General Permit for Stormwater Discharges from Industrial Activities, 73 Fed. Reg. 56,572 (September 29, 2008)("2008 MSGP Permit").

57.    EPA Benchmarks provide an objective standard to determine whether a facility's BMPs are successfully developed and/or implemented. *See* 2000 MSGP Permit at 64766-67, available at http://www.epa.gov/npdes/pubs/msgp2008_finalfs.pdf; 2008 MSGP Permit at 56574.

58.    Receiving Water Limitation C(1) of the Storm Water Permit prohibits storm water discharges that adversely impact human health or the environment.

59.    Receiving Water Limitation C(2) of the Storm Water Permit prohibits storm water discharges that cause or contribute to an exceedance of any "applicable Water Quality Standard in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan."

60.    Receiving Water Limitation C(3) of the Storm Water Permit states that the facility operator "shall submit a report to the appropriate Regional Board that describes the BMPs that are currently being implemented and additional BMPs that will be implemented to prevent or reduce any pollutants that are causing or contributing to the exceedance of water quality standards."

61.    Receiving Water Limitation C(4) of the Storm Water Permit states that the facility operator shall be in violation of the Storm Water Permit if the facility operator submits the report described in C(3) "60 days after either the facility operator or the Regional Water Board determines that discharges are causing or contributing to an exceedance of an applicable water quality standard."

62.     Water Quality Standards ("WQS") are pollutant concentration levels determined by the State Board, the various Regional Boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

63.     The Water Quality Control Plan for the Santa Ana River Basin, California Regional Water Quality Control Board, Santa Ana Region, 3rd Ed., (Rev. June 2011) ("Basin Plan") identifies the "Beneficial Uses" of water bodies in the region. The Beneficial Uses for the Santa Ana River, which received polluted storm water discharges from the Defendants' facilities, include: Municipal and Domestic Supply ("MUN"); Agricultural Supply ("AGR"); Groundwater Recharge ("GWR"); Water Contact Recreation ("REC-1"); Non-contact Water Recreation ("REC-2"); Warm Freshwater Habitat ("WARM"); Wildlife Habitat ("WILD"); Rare, Threatened or Endangered Species ("RARE"); Cold Freshwater Habitat ("COLD"); and Spawning, Reproduction and Development ("SPWN"). *See* Basin Plan at Table 3-1.

64.     Discharges of pollutants at levels above WQS contribute to the impairment of the Beneficial Uses of the waters receiving the discharge.

65.     Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin Plan are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act. According to the 2010 303(d) List of Impaired Water Bodies, Reaches 2, 3, and 4 of the Santa Ana River are impaired for pollutants such as pathogens, copper, lead, and indicator bacteria.[1]

---

[1] 2010 Integrated Report – All Assessed Waters, *available at*: http://www.waterboards.ca.gov/water_issues/programs/tmdl/integrated2010.shtml.

66.     WQS applicable to dischargers covered by the Storm Water Permit include, but are not limited to, those set out in the Basin Plan and in the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

67.     The CTR includes numeric criteria set to protect human health and the environment in the state of California.[2]

68.     Discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of Receiving Water Limitation C(1) of the Storm Water Permit.

69.     Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan, and/or other applicable WQS are violations of Receiving Water Limitation C(2) of the Storm Water Permit.

70.     Unauthorized discharges of materials other than storm water (non-storm water) are violations of Discharge Prohibition A(1) of the Storm Water Permit.

**D.     Storm Water Permit's Storm Water Pollution Prevention Plan Requirements**

71.     Prior to commencing industrial activities, Section A(1) and Provision E(2) of the Storm Water Permit requires a discharger to develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") that complies with the requirements of the Storm Water Permit.

---

[2] Water Quality Standards; Establishment of Numeric Criteria for Priority Toxic Pollutants for the State of California Factsheet, EPA-823-00-008, April 2000 *available at*: http://water.epa.gov/lawregs/rulesregs/ctr/factsheet/cfm.

72.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. Storm Water Permit, Section A(2).

73.     Section A(4) of the Storm Water Permit requires that the SWPPP include a site map that contains: the facility boundaries, storm water drainage areas and directions of flow for each drainage area, on-site surface water bodies, nearby water bodies, areas of soil erosion, and municipal storm drain inlets where the facility's storm water discharges may be received (Section A(4)(a)); the location of the storm water collection, conveyance and discharge system and structural control measures that affect storm water discharges (Section A(4)(b)); an outline of all impervious areas of the facility, including paved areas, buildings, covered storage areas, or other roofed structures (Section (4)(c)); locations where materials are directly exposed to precipitation and where significant spills or leaks have occurred (Section A(4)(d)); and areas of industrial activity, including areas that are actual and potential pollutant sources (Section A(4)(e)).

74.     Section A(5) of the Storm Water Permit requires that the SWPPP include a list of significant materials handled and stored at the site.

75.     Section A(6)(a) of the Storm Water Permit requires that the SWPPP include a narrative description of the facility's industrial activities, associated potential pollutant sources, and potential pollutants that could be discharged in storm water discharges.

76.   Section A(6)(b) of the Storm Water Permit requires that the SWPPP include a summary of all areas of industrial activities, potential pollutant sources, and potential pollutants.

77.   Section A(7)(a) of the Storm Water Permit requires that the SWPPP include a narrative assessment of all industrial activities and potential pollutant sources to determine which areas of the facility are likely sources of pollutants and which pollutants are likely to be present in the storm water discharges. Section A(7)(b) of the Storm Water Permit requires that the SWPPP include a summary of the areas of the facility that are likely sources of pollutants and the corresponding pollutants likely to be present in storm water discharges.

*78.*   Section A(8) of the Storm Water Permit requires that the SWPPP include a narrative description of the storm water BMPs to be implemented at the facility for each potential pollutant and its source. BMPs shall be developed and implemented to reduce or prevent pollutants in storm water discharges. Storm Water Permit, Section A(8). Dischargers must develop and implement structural and/or non-structural BMPs. *Id*., Sections A(8)(a) and (b). Non-structural BMPs that should be considered include: Good Housekeeping, Preventative Maintenance, Spill Response, Material Handling and Storage, Employee Training, Waste Handling/Recycling, Recordkeeping and Internal Reporting, Erosion Control and Site Stabilization, Inspections, and Quality Assurance. Structural BMPs that should be considered include: Overhead Coverage, Retention Ponds, Control Devices, Secondary Containment Structures, and Treatment. *Id.*

79.     Section A(9) of the Storm Water Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the Storm Water Permit. Sections A(9)(a)-(c) of the Storm Water Permit also require that the discharger conduct an annual comprehensive site compliance evaluation that includes a review of all visual observation records, inspection reports, and sampling and analysis results; a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system; a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed; and a visual inspection of equipment needed to implement the SWPPP. Section A(9)(d) of the Storm Water Permit requires that the discharger submit an evaluation report that includes an identification of personnel performing the evaluation, the date(s) of the evaluation(s), necessary SWPPP revisions, a schedule for implementing SWPPP revisions, any incidents of non-compliance and the corrective actions taken, and a certification that the discharger is in compliance with the Storm Water Permit. Storm Water Permit, Section A(9)(d)(i)-(vi). If certification of compliance cannot be provided, the discharger must explain in the evaluation report why the facility is not in compliance with the Storm Water Permit. *Id*., Section A(9)(d). The evaluation report shall be submitted as part of the Annual Report required by Section B(14) of the Storm Water Permit. *Id*.

80.     Section A(10) of the Storm Water Permit requires that the discharger revise the SWPPP as necessary prior to changes in industrial activities, or as otherwise required by the Storm Water Permit.

### E.   Storm Water Permit's Monitoring and Reporting Requirements

81.     Provision E(3) and Section B(1) of the Storm Water Permit require dischargers to develop and implement a Monitoring and Reporting Program ("M&RP") prior to commencing industrial activities.

82.     The objectives of the M&RP are to ensure that BMPs have been adequately developed and implemented, revised if necessary, and to ensure that storm water and non-storm water discharges are in compliance with the Storm Water Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. Storm Water Permit, Sections B(2)(a) and B(2)(b).

83.     The M&RP aids in the implementation and revision of the SWPPP and measures the effectiveness of BMPs to prevent or reduce pollutants in storm water discharges. *Id*., Section B(2)(c) and B(2)(d).

84.     Section B(2)(d) requires that the M&RP "shall be revised" as necessary to ensure compliance with the Storm Water Permit.

85.     Section B(4)(a) of the Storm Water Permit requires dischargers to conduct monthly visual observations of storm water discharges during the first hour of discharge and at all discharge locations during the Wet Season (defined as October 1 – May 30).

86.     Section B(4)(b) of the Storm Water Permit requires discharges to conduct visual observations of storm water discharges that occur during daylight hours that are preceded by at least three (3) working days without storm water discharges and that occur during scheduled facility operating hours.

87.     Section B(4)(c) of the Storm Water Permit requires dischargers to document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, or odor in the discharge, and the source of any pollutants in storm water discharges from the facility. This same section requires dischargers to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. Section B(4)(c) of the Storm Water Permit also requires dischargers to revise the SWPPP as necessary to ensure that BMPs are effectively reducing and/or eliminating pollutants at the facility.

88.     Sections B(5) and B(7) of the Storm Water Permit require dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged.

89.     Section B(5)(a) of the Storm Water Permit requires dischargers to collect storm water samples during the first hour of discharge from the first storm event of the Wet Season and at least one other storm event in the Wet Season. All storm water discharge locations must be sampled. *See* Storm Water Permit, Section B(5)(a). Facility operators that do not collect samples from the first storm event of the Wet Season are still required to collect samples from two other storm events of the Wet Season and must explain in the Annual Report why the first storm event was not sampled. *See id*.

90.     Section B(5)(b) of the Storm Water Permit requires that sampling conducted pursuant to the Storm Water Permit occur during scheduled facility

operating hours that are preceded by at least three (3) working days without storm water discharge.

91.    Section B(5)(c)(i) of the Storm Water Permit requires dischargers to analyze each sample for pH, specific conductance, TSS, and total organic carbon ("TOC"). A discharger may substitute analysis for oil and grease instead of TOC.

92.    Section B(5)(c)(ii) of the Storm Water Permit requires dischargers to analyze each sample for toxic chemicals and other pollutants likely to be present in significant quantities in the storm water discharged from the facility.

93.    Section B(5)(c)(iii) and Table D of the Storm Water Permit require facilities classified as Sector M, such as All Toyot Auto Dismantling, Empire Auto Dismantling, and American Dismantling to analyze storm water samples for TSS, aluminum, iron, and lead, or as required by the Regional Board.

94.    Section B(14) of the Storm Water Permit requires that dischargers submit an Annual Report to the applicable Regional Board by July 1 of each year. The Annual Report must include a summary of visual observations and sampling results, an evaluation of the visual observations and sampling and analysis results, laboratory reports, the annual comprehensive site compliance evaluation report specified in Section A(9), an explanation of why a facility did not implement any activities required, and the records specified in Section B(13).

95.    Section B(15) of the Storm Water Permit allows facility operators to participate in group monitoring. Operators participating in group monitoring must develop and implement a written, site-specific SWPPP and monitoring program in

accordance with the Storm Water Permit and must satisfy all group monitoring requirements.

96.      Section B(15)(b) of the Storm Water Permit requires that each Group Monitoring Plan ("GMP") participant collect and analyze at least two samples in accordance with section B(5) every five years. The samples should be distributed evenly over the five-year period, and must be collected in non-consecutive Wet Seasons.

97.      Section B(15)(f) of the Storm Water Permit requires that sampling and analysis be performed according to Section B of the Storm Water Permit.

98.      Section B(15)(g) of the Storm Water Permit requires that the GMPs be implemented at the beginning of the Wet Season.

99.      Section B(15)(h) requires that GMP participants who are not sampling in a given Wet Season comply with all other "monitoring and reporting requirements" of Section B of the Storm Water Permit, "including the submittal of an Annual Report by July 1 of each year" to the Regional Board.

### F.   Landowner's Responsibility for Discharge

100.      Where a landowner has knowledge of the discharging activity and the ability to control that activity, the landowner may be required to obtain an NPDES permit. *See In the Matter of the Petition of U.S. Dept. of Agric., Forest Serv*., Cal. St. Wat. Res. Bd., Order No. 1987 WL 54537 WQ 87-5 at *2. The same knowledge and control standards apply to landowner liability to clean up and abatement orders issued by the State Board. *In the Matter of the Petition of San Diego Unif. Port Dist*., Cal. St. Wat. Res. Bd., Order No. 1990 WL 272135 at *7.

101.   Where a party controls a point source through which discharge travels, that party may be liable for discharges in violation of the Clean Water Act.

## V.   FACTUAL BACKGROUND

### A.   American Arrow Landowner Liability

102.   Waterkeeper is informed and believes, and thereon alleges, that American Arrow exercises sufficient control over the Property to classify American Arrow as a discharger.

103.   Waterkeeper is informed and believes, and thereon alleges, that American Arrow has violated and continues to violate 33 U.S.C. § 1311(a), which prohibits discharge of pollutants to water of the United States without a Storm Water Permit.

104.   Waterkeeper is informed and believes, and thereon alleges, that American Arrow and All Toyot are contracted in a lease arrangement.

105.   Waterkeeper is informed and believes, and thereon alleges, that American Arrow and Empire are contracted in a lease arrangement.

106.   Waterkeeper is informed and believes, and thereon alleges, that American Arrow and American Dismantling are contracted in a lease arrangement.

107.   Waterkeeper is informed and believes, and thereon alleges, that American Arrow knows of the potential for discharges at the Property from All Toyot, Empire, and American Dismantling, and has the ability under lease provisions to control those activities.

108.   Waterkeeper is informed and believes, and thereon alleges, that a leasing contract between American Arrow and each of its tenants does not absolve

American Arrow of its liability for violations by its tenants under the Clean Water Act.

109.     Waterkeeper is informed and believes, and thereon alleges, that American Arrow, as a landowner, retains control the Property because it could act to prevent structural modification of its property that results in discharge.

110.     Waterkeeper is informed and believes, and thereon alleges, that there was a hole in the perimeter wall of the Property located at the southwest corner of 8569 Beech property from which storm water runoff was released. The hole was patched in November 2014, but after a storm event in March 2014, Waterkeeper observed a new hole in the wall from which storm water escapes.

111.     Waterkeeper is informed and believes, and thereon alleges, that the appearance, disappearance, and reappearance of holes in the exterior wall of the property owned by American Arrow indicate a repeating pattern of discharging behavior.

112.     Waterkeeper is informed and believes, and thereon alleges, that American Arrow has constructive knowledge of the discharges at the Property.

113.     Waterkeeper is informed and believes, and thereon alleges, that because American Arrow's owner, Hasmik Kupalyan, is also the owner of American Dismantling, one of American Arrow's tenants and an automotive dismantler, American Arrow has knowledge of the repeating pattern of holes in the wall of the Property, and the discharges from those holes.

114.     Waterkeeper is informed and believes, and thereon alleges, that, similar to *Lucas* where the defendants were held directly responsible for certifying

the septic systems even though a contractor handled the actual installation, American Arrow's knowledge of the repeating discharge from the hole in the property wall is tacit certification of the discharge.

115.   Waterkeeper is informed and believes, and thereon alleges, that American Arrow "causes" the storm water discharge from the hole in the property wall even though American Arrow may not directly use the hole to discharge pollutants.

116.   Waterkeeper is informed and believes, and thereon alleges, that American Arrow can be held liable for discharges because American Arrow has knowledge that the infrastructure of its property is faulty. An uncovered dirt lot property, without proper drainage, with a hole at the low side of the property that appears after a storm event, is not conducive to prevention of effluent discharge.

117.   Waterkeeper is informed and believes, and thereon alleges, that American Arrow has knowledge that discharges may occur from its tenants' facilities.

118.   Waterkeeper is informed and believes, and thereon alleges, that American Arrow's ownership of a property used exclusively for auto dismantling, an industrial business involving risk that harmful effluents will pass into navigable waters if not properly and carefully managed. A landowner that allows his property to be used in such a manner reasonably should know that a discharge might occur.

119.   Waterkeeper is informed and believes, and thereon alleges, that because Waterkeeper's prior observations of the Property have revealed automobile parts stacked above the walls, unroofed and otherwise unshielded from

rain, piled around the perimeter of the Property, and has also revealed a hole in the wall of the 8569 Beech Ave. property, American Arrow has constructive knowledge of unpermitted discharges from its tenants' facilities.

120.   Waterkeeper is informed and believes, and thereon alleges, that American Arrow's principal officer operates an auto-dismantler on one of the parcels of the Property.

121.   Waterkeeper is informed and believes, and thereon alleges, that because American Arrow is also the owner of American Dismantling, American Arrow likely has direct knowledge of American Dismantling's storm water discharge.

**B.   Defendants' Storm Water Permit Coverage**

   ***i.   All Toyot Auto Dismantling***

122.   Waterkeeper is informed and believes, and thereon alleges, that the State Board confirmed receipt of the Notice of Intent to Obtain Storm Water Permit coverage ("NOI Receipt") for All Toyot on March 27, 2009.

123.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot's NOI and NOI Receipt identify the operator of the All Toyot facility as "All Toyot Auto Dismantling."

124.   Waterkeeper is informed and believes, and thereon alleges, All Toyot's NOI and NOI Receipt lists the contact person for All Toyot as Mohammad Reza Taherian.

125.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot's NOI is undated.

126.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot's NOI and NOI Receipt identify All Toyot's facility name as "All Toyot Auto Dismantling" and address at "8569 Beech Ave B Fontana CA 92335."

127.   Waterkeeper is informed and believes, and thereon alleges, that the State Board Storm Water Multiple Application & Report Tracking System ("SMARTS") identifies the All Toyot facility owner/operator as "All Toyot Auto Dismantling" and the address as "8569 Beech Ave B Fontana California 92335."

128.   Waterkeeper is informed and believes, and thereon alleges, that SMARTS identifies the All Toyot facility name and location as "All Toyot Auto Dismantling 8569 Beech Ave B Fontana California 92335."

129.   Waterkeeper is informed and believes, and thereon alleges, that SMARTS lists the All Toyot facility coverage under the Storm Water Permit as "Active."

130.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot's NOI, All Toyot's NOI Receipt, and SMARTS list the Waste Discharge Identification ("WDID") number for All Toyot as 836I022090.

131.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot's NOI indicates that the All Toyot facility is approximately 0.75 acres in size.

132.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot's NOI and NOI Receipt list the Standard Industrial Classification ("SIC") code for the All Toyot facility as 5015.

### ii. *Empire Auto Dismantling*

133.    Waterkeeper is informed and believes, and thereon alleges, that the State Board confirmed receipt of the NOI for Empire on July 07, 2010.

134.    Waterkeeper is informed and believes, and thereon alleges, that Empire's NOI is undated.

135.    Waterkeeper is informed and believes, and thereon alleges, that Empire's NOI and NOI Receipt identify the Empire facility name as "Empire Auto Dismantling" and address at "8569 Beach Ave No C Fontana CA 92335."

136.    Waterkeeper is informed and believes, and thereon alleges, that Empire's NOI and NOI Receipt identify the operator of the Empire facility as "Empire Auto Dismantling."

137.    Waterkeeper is informed and believes, and thereon alleges, that Empire's NOI and NOI Receipt lists the contact person for Empire as George Adzhinyan.

138.    Waterkeeper is informed and believes, and thereon alleges, that SMARTS identifies the Empire facility owner/operator as "Empire Auto Dismantling" and the address as "8569 Beach Ave No C Fontana California 92335."

139.    Waterkeeper is informed and believes, and thereon alleges, that SMARTS identifies the Empire facility name and location as "Empire Auto Dismantling 8569 Beach Ave No C Fontana California 92335."

140.   Waterkeeper is informed and believes, and thereon alleges, that SMARTS lists the Empire facility's coverage under the Storm Water Permit as "Active."

141.   Waterkeeper is informed and believes, and thereon alleges, that Empire's NOI, Empire's NOI Receipt, and SMARTS lists the Empire facility WDID number as 836I022710.

142.   Waterkeeper is informed and believes, and thereon alleges, that Empire's NOI indicates that the Empire facility is approximately 420 square feet in size.

143.   Waterkeeper is informed and believes, and thereon alleges, that Empire's SWPPP indicates that the Empire facility is half an acre in size.

144.   Waterkeeper is informed and believes, and thereon alleges, that Empire's NOI and NOI Receipt list the SIC code for the Empire facility as 5015.

### iii.    *American Dismantling*

145.   Waterkeeper is informed and believes, and thereon alleges, that the State Board confirmed receipt of the NOI for American Dismantling on July 11, 2012.

146.   Waterkeeper is informed and believes, and thereon alleges, that American Dismantling's NOI is undated.

147.   Waterkeeper is informed and believes, and thereon alleges, that American Dismantling's NOI and NOI Receipt identify the American Dismantling facility name as "American Dismantling, Inc." and address as "15303 Arrow Hwy Fontana CA 92335."

148.   Waterkeeper is informed and believes, and thereon alleges, that American Dismantling's NOI and NOI Receipt identify the operator of the American Dismantling facility as "American Dismantling, Inc."

149.   Waterkeeper is informed and believes, and thereon alleges, that American Dismantling's NOI and NOI Receipt identify the contact person for American Dismantling as Hasmik Kupalyan.

150.   Waterkeeper is informed and believes, and thereon alleges, that SMARTS identifies the American Dismantling facility owner/operator as "American Dismantling, Inc." and the address as "15303 Arrow Hwy Fontana California 92335."

151.   Waterkeeper is informed and believes, and thereon alleges, that SMARTS identifies the American Dismantling facility name as "American Dismantling, Inc." and the facility address as "15303 Arrow Hwy Fontana California 92335."

152.   Waterkeeper is informed and believes, and thereon alleges, that SMARTS lists the American Dismantling facility's coverage under the Storm Water Permit as "Active."

153.   Waterkeeper is informed and believes, and thereon alleges, that American Dismantling's NOI, American Dismantling's NOI Receipt, and SMARTS lists the American Dismantling facility WDID number as 836I023719.

154.   Waterkeeper is informed and believes, and thereon alleges, that American Dismantling's NOI indicates that the American Dismantling facility is approximately 0.68 acres in size.

155.   Waterkeeper is informed and believes, and thereon alleges, that American Dismantling's NOI and NOI Receipt list the SIC code for the American Dismantling facility as 5015.

### C.      Industrial Activities and Associated Pollutants at the Facilities

156.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot, Empire, and American Dismantling together occupy three parcels of land owned by American Arrow, currently designated by the San Bernardino County Property Information Management System as Parcel 0232-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 at 8569 Beech Ave., Parcel 0232-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 and Parcel 0232-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 at 15303 Arrow Ave.

157.   Waterkeeper is informed and believes, and thereon alleges, that Empire's SWPPP describes the Empire facility as a "long narrow piece running north to south. The only entrance is at the south end of the property alongside the main office building located in the east corner. The dismantling and repair building is located in the west end of the site. The property is a combination of concrete and dirt surfaces and surrounded by corrugated metal fencing. The west end of the property is slightly angled with the south side of the property being 15 feet longer than the north."

158.   Waterkeeper is informed and believes, and thereon alleges, that the point of egress/ingress to the Empire and All Toyot facilities include one (1) driveway along Beech Avenue.

159.   Waterkeeper is informed and believes, and thereon alleges, that the point of egress/ingress to the American Dismantling facility includes one (1) driveway along Arrow Boulevard.

160.   Waterkeeper is informed and believes, and thereon alleges, that the Defendants' industrial activities and areas of industrial activity are pollutant sources.

161.   Waterkeeper is informed and believes, and thereon alleges, that the following industrial activities are conducted at the Defendants' facilities: dismantling and/or wrecking of used motor vehicles for parts recycling or resale and for scrap.

162.   Waterkeeper is informed and believes, and thereon alleges, hazardous wastes such as engine oil, hydraulic fluid, transmission fluid, gear oil, grease, antifreeze, coolant, red dye diesel, used oil, waste absorbent, household hazardous waste, fluff, metals, batteries, soap solvents, and pH affecting substances are stored and/or generated at the Defendants' facilities.

163.   Waterkeeper is informed and believes, and thereon alleges, that pollutants associated with operations at the Defendants' facilities include, but are not limited to: suspended solids, aluminum, iron, lead, zinc and copper.

164.   Waterkeeper is informed and believes, and thereon alleges, that some or all of the industrial activities occur throughout the Defendants' facilities without adequate cover to prevent storm water and non-storm water exposure to pollutant sources.

165.   Waterkeeper is informed and believes, and thereon alleges, that industrial activities occur throughout the Defendants' facilities outdoors without secondary containment or other adequate treatment measures to prevent polluted storm water and non-storm water from discharging from the Defendants' facilities.

166.   Waterkeeper is informed and believes, and thereon alleges, that materials associated with industrial activities are stored near driveways and discharge points leading out of the Defendants' facilities onto Beech Boulevard.

167.   Waterkeeper is informed and believes, and thereon alleges, that automobile parts are stacked above the walls, unroofed and otherwise unshielded from rain, around the perimeter of the Property.

168.   Waterkeeper is informed and believes, and thereon alleges, that there were oil stains, uncovered salvaged engine parts, and various chemical containers that were stored without secondary containment at the Empire facility.

169.   Waterkeeper is informed and believes, and thereon alleges, that Regional Board Inspectors have observed that All Toyot's housekeeping was an issue because oil stains were seen near the dismantled vehicles, salvaged engine parts were not covered, and batteries were stored near the office trailers and the dismantling area.

170.   Waterkeeper is informed and believes, and thereon alleges, that Regional Board Inspectors observed that American Dismantling's concrete containment berm was in disrepair, that a fifty-five gallon drum of liquid soap was not properly placed in secondary containment, that there was evidence of outdoor

washing at the site, and that there were various parts at the site grounds without secondary containment or cover.

171.    Waterkeeper is informed and believes, and thereon alleges, that pollutants are tracked offsite through the movement of vehicles in and out of the Defendants' facilities.

172.    Waterkeeper is informed and believes, and thereon alleges, that the Defendants have failed to adequately develop and/or implement BMPs to prevent the exposure of pollutants and their sources to storm water flows at the Defendants' facilities in violation of the Storm Water Permit and the Clean Water Act.

173.    Waterkeeper is informed and believes, and thereon alleges, that the Defendants' failure to properly address pollutants and their sources results in the discharge of pollutants from the Defendants' facilities to the Etiwanda/San Sevaine Channel, the Santa Ana River, and the Pacific Ocean in violation of the Storm Water Permit and the Clean Water Act.

174.    Waterkeeper is informed and believes, and thereon alleges, that the Defendants' failed to adequately develop and/or implement BMPs sufficient to prevent polluted storm from discharging from the Defendants' facilities in violation of the Storm Water Permit and the Clean Water Act.

175.    Waterkeeper is informed and believes, and thereon alleges, that the Defendants have failed to adequately develop and/or implement required BMPs to prevent prohibited non-storm water discharges from discharging from the

Defendants' facilities in violation of the Storm Water Permit and the Clean Water Act.

**D.     Storm Water Discharge Points**

176.   Waterkeeper is informed and believes, and thereon alleges, that, All Toyot's 2010-2011 Annual Report, 2011-2012 Annual Report, and 2013-2014 Annual Report each indicate that there is one discharge location at the All Toyot facility.

177.   Waterkeeper is informed and believes, and thereon alleges, that a discharge point at the All Toyot facility is located in the southwest corner of the property.

178.   Waterkeeper is informed and believes, and thereon alleges, that a discharge point at the All Toyot facility was patched in November 2013, but upon a new storm event in March 2014, Waterkeeper observed a new hole in the southwest corner of the wall of the 8569 Beech Ave. property to relieve runoff during storm events from which leachate would pour onto the street and down the storm drain on the Property.

179.   Waterkeeper is informed and believes, and thereon alleges, that a large rock has been placed in front of the aforementioned hole to block storm water sample collection.

180.   Waterkeeper is informed and believes, and thereon alleges, that storm water runoff drains, after major storm events, from north to south and pools at the southwest corner of the Property.

181.   Waterkeeper is informed and believes, and thereon alleges, that Empire's Annual Reports each indicate that there one discharge location at the Empire facility.

182.   Waterkeeper is informed and believes, and thereon alleges, that American Dismantling's Annual Reports each indicate that there is one discharge location at the American Dismantling facility.

### E.   Waters Receiving Defendants' Discharges

183.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot's NOI identifies the "Santa Ana River" as the name of the water receiving discharges from the All Toyot facility.

184.   Waterkeeper is informed and believes, and thereon alleges, that Empire's NOI identifies the "Santa Ana River" as the name of the water receiving discharges from the Empire facility.

185.   Waterkeeper is informed and believes, and thereon alleges, that American Dismantling's NOI identifies the "Santa Ana River" as the name of the water receiving discharges the American Dismantling facility.

186.   Waterkeeper is informed and believes, and thereon alleges, that a storm event is a rainfall event with greater than 0.1 inches of rainfall. 40 C.F.R. §122.21(g)(7)(ii).

187.   Waterkeeper is informed and believes, and thereon alleges, that polluted storm water associated with industrial activities discharges from the Defendants' facilities during every storm event and any other time storm water discharges from Defendants' facilities.

188.   Waterkeeper is informed and believes, and thereon alleges, that pollutants from the Defendants' facilities discharge to the Receiving Waters via storm drain inlets and into the City of Fontana's storm drain system.

189.   Waterkeeper is informed and believes, and thereon alleges, that the Receiving Waters into which the Defendants discharge polluted storm water are waters of the United States.

190.   Waterkeeper is informed and believes, and thereon alleges that polluted discharges from the Defendants' facilities contribute to the degradation of the Etiwanda/San Sevaine Channel, a tributary to the Santa Ana River, and the Pacific Ocean and its shoreline.

191.   Waterkeeper is informed and believes, and thereon alleges, that polluted discharges from the Defendants' facilities contribute to the degradation of the Santa Ana River, an impaired surface water, and aquatic dependent wildlife.

**F.     The Storm Water Discharges Contain Elevated Levels of Pollutants**

192.   Storm water discharges containing heavy metals, such as copper, lead, and zinc, adversely affect the aquatic environment.

### *i.     All Toyot Auto Dismantling*

193.   Waterkeeper is informed and believes, and thereon alleges, that discharges from All Toyot's facility contains levels of pollutants, including aluminum, iron, zinc, TSS, lead, and copper, in excess of levels known to adversely impact aquatic species and the environment, WQS, and EPA

Benchmarks in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

194.   Waterkeeper is informed and believes, and thereon alleges, that sampling by Waterkeeper on February 28, 2014 at 8569 Beech Ave. shows that discharges from All Toyot's operations exceed EPA pollutant benchmarks for: Total Recoverable Aluminum by 20 times the EPA benchmark level, Total Recoverable Iron by 17 times the EPA benchmark level, Total Recoverable Zinc by 7.52 times the EPA benchmark level, Total Suspended Solids by 5 times the EPA benchmark level, Total Recoverable Lead by 3.31 times the EPA benchmark level, and Total Recoverable Copper by 2.36 times the EPA benchmark level.

195.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot has not implemented or formulated BMPs that achieve BAT and/or BCT standards in violation of the Storm Water Permit.

196.   Waterkeeper is informed and believes, and thereon alleges, that during every storm event or any other storm water discharge that has occurred at All Toyot since 2010 through the present, All Toyot has discharged and continues to discharge storm water that contains contaminants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit.

### ii.    *Empire Auto Dismantling*

197.   Waterkeeper is informed and believes, and thereon alleges, that discharges from Empire's facility contains levels of pollutants, including aluminum, iron, zinc, TSS, lead, and copper, in excess of levels known to adversely impact aquatic species and the environment, WQS, and EPA

Benchmarks in violation of the Storm Water Permit's Effluent Limitations and Receiving Water Limitations.

198.   Waterkeeper is informed and believes, and thereon alleges, that sampling data collected by Waterkeeper on February 28, 2014 at 8569 Beech Ave. show that discharges from Empire exceeded the EPA Benchmarks of: Total Suspended Solids by 5 times the EPA benchmark level, Total Recoverable Aluminum by 20 times the EPA benchmark level, Total Recoverable Iron by 17 times the EPA benchmark level, Total Recoverable Zinc by 7.52 times the EPA benchmark level, Total Recoverable Lead by 3.31 times the EPA benchmark level, and Total Recoverable Copper by 2.36 times the EPA benchmark level.

199.   Waterkeeper is informed and believes, and thereon alleges, that Empire's Group Monitoring Plan sampling averages exceed EPA benchmarks for the applicable industrial sector.

200.   Waterkeeper is informed and believes, and thereon alleges, that Empire has not implemented or formulated BMPs that achieve BAT and/or BCT standards in violation of the Storm Water Permit.

201.   Waterkeeper is informed and believes, and thereon alleges, that during every storm event or any other storm water discharge that has occurred at Empire's facility since 2010 through the present, Empire has discharged and continues to discharge storm water that contains contaminants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit.

### iii.   *American Dismantling*

202.   Waterkeeper is informed and believes, and thereon alleges, that, given the industrial nature of American Dismantling's business, American Dismantling has discharged and continues to discharge storm water that contains contaminants at levels that violate the prohibitions and limitations set forth in the Storm Water Permit.

### G.   **Failure to Develop and/or Implement an Adequate Storm Water Pollution Prevention Plan**

### i.   *All Toyot Auto Dismantling*

203.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot failed and continues to fail to develop and implement an adequate SWPPP that complies with Section A of the Storm Water Permit.

204.   Waterkeeper is informed and believes, and thereon alleges, that on January 07, 2013, Regional Board Inspectors were refused access to the All Toyot facility and were unable to perform their annual evaluation. The Regional Board Inspectors observed upon visiting, however, that "housekeeping was an issue. Oil stains could be seen near the dismantled vehicles. Salvaged engine parts were not covered. Batteries were stored near the office trailers and dismantling area."

205.   Waterkeeper is informed and believes, and thereon alleges, that because even cursory observation by the inspectors revealed numerous pollutant hazards, All Toyot's BMPs have not been implemented, are not adequate, or have not been formulated in violation of Section A(8) of the Storm Water Permit.

### ii.      *Empire Auto Dismantling*

206.   Waterkeeper is informed and believes, and thereon alleges, that Empire failed and continues to fail to develop and implement an adequate SWPPP that complies with Section A of the Storm Water Permit.

207.   Waterkeeper is informed and believes, and thereon alleges, that Empire has failed to include a site map of its facility in its SWPPP in violation of Section A(4) of the Storm Water Permit.

208.   Waterkeeper is informed and believes, and thereon alleges, that Empire's SWPPP states that it will accomplish Good Housekeeping by thoroughly cleaning the yard "of parts, dirt absorbent, fluids, trash and debris," by elevating and covering "rusty, oily, greasy and dirty materials," and by cleaning "immediately" areas where "fresh pollutants or pollutant residues are present on surfaces."

209.   Waterkeeper is informed and believes, and thereon alleges, that on January 07, 2013, Regional Board Inspectors were refused access to Empire's facility and were unable to perform their annual evaluation. The Regional Board Inspectors observed upon visiting, however, that "housekeeping was an issue. Oil stains could be seen near the dismantled vehicles. Salvaged engine parts were not covered. Various chemical containers were stored without secondary containment near the main office trailer."

210.   Waterkeeper is informed and believes, and thereon alleges, that because even cursory observation by the Regional Board Inspectors revealed numerous pollutant hazards, Empire's BMPs have not been implemented, are not

adequate, or have not been formulated in violation of Section A(8) of the Storm Water Permit.

### iii.    *American Dismantling*

211.   Waterkeeper is informed and believes, and thereon alleges, that American Dismantling failed and continues to fail to develop and implement an adequate SWPPP that complies with Section A of the Storm Water Permit.

212.   Waterkeeper is informed and believes, and thereon alleges, that the Regional Board Inspectors observed on June 24, 2010 several deficiencies which indicate that American Dismantling failed to implement BMPs that comply with section A(8) of the Storm Water Permit.

213.   Waterkeeper is informed and believes, and thereon alleges, that upon inspection of the property by the Regional Board on June 24, 2010 under the previous operator, American Truck Dismantling, Regional Board Inspectors noted that the implemented BMPs were "not sufficient to contain the myriad of leaks and spills on the facility grounds," that "there is evidence of outdoor washing of motor vehicle parts," that a "1-55 gallon [drum] of liquid soap [was on the] yard without secondary containment," that "the secondary containment (basin) concrete berm is broken; thereby rending it ineffective," and that "there are numerous auto parts…with oil faxed to them [which] are not covered, and are not in secondary containment."

214.   Waterkeeper is informed and believes, and thereon alleges, that because even cursory observation by the Regional Board Inspectors revealed numerous pollutant hazards, American Dismantling's BMPs have not been

implemented, are not adequate, or have not been formulated in violation of Section A(8) of the Storm Water Permit.

**H.     Failure to Comply with the Storm Water Permit's Monitoring and Sampling Requirements**

*i.      All Toyot Auto Dismantling*

215.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot failed and continues to fail to develop and implement an adequate M&RP that complies with Section B of the Storm Water Permit.

216.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot failed to collect storm water samples for four (4) consecutive annual periods since 2010 in violation of Section B(5) of the Storm Water Permit.

217.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot gave the following reason for its failure to collect storm water samples in the period of 2010-2011: "No qualified discharges occurred at the site during the season that were during working or did not have 3 previous days of dry weather, on weekends or during Christmas."

218.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot gave the following reason for its failure to collect storm water samples in the period of 2011-2012: "site did not have a discharge this season as the water pools inside the property and evaporates. No storm was large enough this year to cause these to discharge into the storm water system."

219.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot gave the following reason for its failure to collect storm water samples in the

period of 2012-2013: "all water on site ponds in the center area," and "no rainfall this year was great enough to cause any discharges."

220.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot gave the following reason for its failure to collect storm water samples in the period of 2013-2014: "The rain water pools and evaporates unless storm is large & extended. We did not have <u>any</u> discharge in 2013-14."

221.   Waterkeeper is informed and believes, and thereon alleges, that for the period 2010-2011, there were seven (7) reportable storm events: Friday, October 1, 2010, .15 inches; Monday, October 25, 2010, .28 inches; Monday, November 8, 2010, .23 inches; Thursday, December 16, 2010, .17 inches; Wednesday, February 16, 2011, .39 inches; Friday, February 25, 2011, .46 inches; and Tuesday, May 17, 2011, .15 inches.

222.   Waterkeeper is informed and believes, and thereon alleges, that for the period 2011-2012, there were six (6) reportable storm events: Wednesday, October 5, 2011, 1.02 inches; Friday, November 4, 2011, .31 inches; Monday, December 12, 2011, .34 inches; Wednesday, February 15, 2012, .2 inches; Wednesday, April 11, 2012, .33 inches; and Thursday, April 26, 2012, .23 inches.

223.   Waterkeeper is informed and believes, and thereon alleges, that for the period 2012-2013, there were eleven (11) reportable storm events: Thursday, October 11, 2012, .28 inches; Thursday, November 8, 2012, .14 inches; Thursday, November 29, 2012, .15 inches; Wednesday, December 12, 2012, .19 inches; Tuesday, December 18, 2012, .28 inches; Monday, December 24, 2012, .27 inches; Thursday, January 24, 2013, .21 inches; Friday, February 8, 2013, .36 inches;

Tuesday, February 19, 2013, .34 inches; Thursday, March 7, 2013, .12 inches; and

Monday, May 6, 2013, .14 inches.

224.   Waterkeeper is informed and believes, and thereon alleges, that for the

period 2013-2014, there were eight (8) reportable storm events: Wednesday,

October 9, 2013, .18 inches; Monday, October 28, 2013, .19 inches; Thursday,

November 21, 2013, .70 inches; Thursday, December 19, 2013, .32 inches;

Thursday, February 6, 2014, .13 inches; Thursday, February 27, 2014, .30 inches;

Wednesday, April 2, 2014, .15 inches; and Friday, April 25, 2014, .25 inches.

225.   Waterkeeper is informed and believes, and thereon alleges, that for the

period 2014-2015, there were four (4) reportable storm events: Friday, November

21, 2014, .2 inches; Friday December 12, 2014, 1.6 inches; Monday, January 16,

2015, .29 inches; and Monday, February 23, 2015, .24 inches.

226.   Waterkeeper is informed and believes, and thereon alleges, that All

Toyot's claim that storm water after a storm event "pools and evaporates" is likely

false. After a rain event on March 17, 2012 with 1.07 inches of rainfall, with no

prior rainfall for more than a month, Waterkeeper photographed discharge

emanating from the Property.

227.   Waterkeeper is informed and believes, and thereon alleges, that All

Toyot's claims for its failures to collect storm water samples for four (4) annual

consecutive periods since 2010 are incorrect, in violation of Section B and Section

C of the Storm Water Permit.

228.   Waterkeeper is informed and believes, and thereon alleges, that the

All Toyot failed and continue to fail to revise the M&RP for the facility as

necessary to ensure compliance with the Storm Water Permit, in violation of Section B(2)(d) of the Storm Water Permit.

229.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot failed to collect two (2) samples from each of the discharge points over the past five years, as required by Section B(15) and B(5)(a) of the Storm Water Permit.

230.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot failed to collect samples during the first storm event of the Wet Season over the past five years, in violation of Section B(15) and B(5)(a) of the Storm Water Permit.

231.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot has failed to conduct visual observations of storm water discharges from all discharge points from one storm event per month in violation of Section B(4) of the Storm Water Permit.

232.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot has failed to document the presence of any floating or suspended material, O&G, discolorations, turbidity, odor, or the source of any pollutants, in violation of Section B(4) of the Storm Water Permit.

233.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot has failed and continue to fail to adequately revise the M&RP for the All Toyot facility as necessary to ensure compliance with the Storm Water Permit, in violation of Sections A(9) and A(10) of the Storm Water Permit.

### ii.    *Empire Auto Dismantling*

234.    Waterkeeper is informed and believes, and thereon alleges, that Empire failed and continues to fail to develop and implement an adequate M&RP that complies with Section B of the Storm Water Permit.

235.    Waterkeeper is informed and believes, and thereon alleges, that Empire participates in group monitoring under SoCal Group Monitoring Plan ("GMP"), but failed to collect and analyze samples from at least two storm events over the five-year period of the permit in violation of Section B(15) of the Storm Water Permit.

236.    Waterkeeper is informed and believes, and thereon alleges, that Empire failed to collect storm water samples for four (4) consecutive annual periods since 2010 in violation of Section B(5) of the Storm Water Permit.

237.    Waterkeeper is informed and believes, and thereon alleges, that Empire's SWPPP states that storm water pools and evaporates onsite and that the only discharges would occur to the adjoining lot to the west.

238.    Waterkeeper is informed and believes, and thereon alleges, that Empire stated in the 2010-2011 Annual Report "No Qualified Discharge" as its reason for failing to collect storm water samples for that period.

239.    Waterkeeper is informed and believes, and thereon alleges, that Empire stated in the 2011-2012 Annual Report "no discharge during bus hrs" as its reason for failing to collect storm water samples for that period.

240.    Waterkeeper is informed and believes, and thereon alleges, that Empire stated in its 2012-2013 Annual Report "there were no rain events during

this stormwater year at this facility that met the standard of a Qualified Discharge, as defined by the Industrial Storm Water General Permit" as its reason for failing to collect storm water samples for that period.

241.   Waterkeeper is informed and believes, and thereon alleges, that Empire did not give a reason in its 2013-2014 Annual Report for its failure to collect storm water samples for that period, as required by Section B(14) of the Storm Water Permit.

242.   Waterkeeper is informed and believes, and thereon alleges, that for the period 2010-2011, there were seven (7) reportable storm events: Friday, October 1, 2010, .15 inches; Monday, October 25, 2010, .28 inches; Monday, November 8, 2010, .23 inches; Thursday, December 16, 2010, .17 inches; Wednesday, February 16, 2011, .39 inches; Friday, February 25, 2011, .46 inches; and Tuesday, May 17, 2011, .15 inches.

243.   Waterkeeper is informed and believes, and thereon alleges, that for the period 2011-2012, there were six (6) reportable storm events: Wednesday, October 5, 2011, 1.02 inches; Friday, November 4, 2011, .31 inches; Monday, December 12, 2011, .34 inches; Wednesday, February 15, 2012, .2 inches; Wednesday, April 11, 2012, .33 inches; and Thursday, April 26, 2012, .23 inches.

244.   Waterkeeper is informed and believes, and thereon alleges, that for the period 2012-2013, there were eleven (11) reportable storm events: Thursday, October 11, 2012, .28 inches; Thursday, November 8, 2012, .14 inches; Thursday, November 29, 2012, .15 inches; Wednesday, December 12, 2012, .19 inches; Tuesday, December 18, 2012, .28 inches; Monday, December 24, 2012, .27 inches;

Thursday, January 24, 2013, .21 inches; Friday, February 8, 2013, .36 inches; Tuesday, February 19, 2013, .34 inches; Thursday, March 7, 2013, .12 inches; and Monday, May 6, 2013, .14 inches.

245.   Waterkeeper is informed and believes, and thereon alleges, that for the period 2013-2014, there were eight (8) reportable storm events: Wednesday, October 9, 2013, .18 inches; Monday, October 28, 2013, .19 inches; Thursday, November 21, 2013, .70 inches; Thursday, December 19, 2013, .32 inches; Thursday, February 6, 2014, .13 inches; Thursday, February 27, 2014, .30 inches; Wednesday, April 2, 2014, .15 inches; and Friday, April 25, 2014, .25 inches.

246.   Waterkeeper is informed and believes, and thereon alleges, that for the period 2014-2015, there were four (4) reportable storm events: Friday, November 21, 2014, .2 inches; Friday December 12, 2014, 1.6 inches; Monday, January 16, 2015, .29 inches; and Monday, February 23, 2015, .24 inches.

247.   Waterkeeper is informed and believes, and thereon alleges, that Empire's claims for its failures to collect storm water samples for four (4) annual consecutive periods since 2010 are incorrect, in violation of Section B and Section C of the Storm Water Permit.

248.   Waterkeeper is informed and believes, and thereon alleges, that the Empire failed and continue to fail to revise the M&RP for the facility as necessary to ensure compliance with the Storm Water Permit, in violation of Section B(2)(d) of the Storm Water Permit.

249.   Waterkeeper is informed and believes, and thereon alleges, that Empire failed to collect two (2) samples from each of the discharge points over the

past five years, as required by Section B(15) and B(5)(a) of the Storm Water Permit.

250.   Waterkeeper is informed and believes, and thereon alleges, that Empire failed to collect samples during the first storm event of the Wet Season over the past five years, in violation of Section B(15) and B(5)(a) of the Storm Water Permit.

251.   Waterkeeper is informed and believes, and thereon alleges, Empire has failed to conduct visual observations of storm water discharges from all discharge points from one storm event per month in violation of Section B(4) of the Storm Water Permit.

252.   Waterkeeper is informed and believes, and thereon alleges, that Empire has failed to document the presence of any floating or suspended material, O&G, discolorations, turbidity, odor, or the source of any pollutants, in violation of Section B(4) of the Storm Water Permit.

253.   Waterkeeper is informed and believes, and thereon alleges, that Empire has failed and continue to fail to adequately revise the M&RP for the Empire facility as necessary to ensure compliance with the Storm Water Permit, in violation of Sections A(9) and A(10) of the Storm Water Permit.

### iii.   *American Dismantling*

254.   Waterkeeper is informed and believes, and thereon alleges, that American Dismantling failed and continues to fail to develop and implement an adequate M&RP that complies with Section B of the Storm Water Permit.

255.   Waterkeeper is informed and believes, and thereon alleges, that American Dismantling failed to collect storm water samples for two (2) consecutive annual periods since 2012 in violation of Section B(5) of the Storm Water Permit.

256.   Waterkeeper is informed and believes, and thereon alleges, that American Dismantling stated in its 2012-2013 Annual Report "no discharge from [the] yard" because "yard water flows into yard and walls and berm contain" as the reason for its failure to collect storm water samples.

257.   Waterkeeper is informed and believes, and thereon alleges, that American Dismantling failed to give a reason for not collecting storm water samples in the 2013-2014 Annual Report as required by Section B(14) of the Storm Water Permit.

258.   Waterkeeper is informed and believes, and thereon alleges, that for the period 2012-2013, there were eleven (11) reportable storm events: Thursday, October 11, 2012, .28 inches; Thursday, November 8, 2012, .14 inches; Thursday, November 29, 2012, .15 inches; Wednesday, December 12, 2012, .19 inches; Tuesday, December 18, 2012, .28 inches; Monday, December 24, 2012, .27 inches; Thursday, January 24, 2013, .21 inches; Friday, February 8, 2013, .36 inches; Tuesday, February 19, 2013, .34 inches; Thursday, March 7, 2013, .12 inches; and Monday, May 6, 2013, .14 inches.

259.   Waterkeeper is informed and believes, and thereon alleges, that for the period 2013-2014, there were eight (8) reportable storm events: Wednesday, October 9, 2013, .18 inches; Monday, October 28, 2013, .19 inches; Thursday,

November 21, 2013, .70 inches; Thursday, December 19, 2013, .32 inches; Thursday, February 6, 2014, .13 inches; Thursday, February 27, 2014, .30 inches; Wednesday, April 2, 2014, .15 inches; and Friday, April 25, 2014, .25 inches.

260.   Waterkeeper is informed and believes, and thereon alleges, that for the period 2014-2015, there were four (4) reportable storm events: Friday, November 21, 2014, .2 inches; Friday December 12, 2014, 1.6 inches; Monday, January 16, 2015, .29 inches; and Monday, February 23, 2015, .24 inches.

261.   Waterkeeper is informed and believes, and thereon alleges, that American Dismantling's claims for its failures to collect storm water samples for two (2) annual consecutive periods since 2010 are incorrect, in violation of Section B and Section C of the Storm Water Permit.

262.   Waterkeeper is informed and believes, and thereon alleges, that the American Dismantling failed and continue to fail to revise the M&RP for the facility as necessary to ensure compliance with the Storm Water Permit, in violation of Section B(2)(d) of the Storm Water Permit.

263.   Waterkeeper is informed and believes, and thereon alleges, that American Dismantling failed to collect two (2) samples from each of the discharge points over the past three years, as required by Section B(15) and B(5)(a) of the Storm Water Permit.

264.   Waterkeeper is informed and believes, and thereon alleges, that American Dismantling failed to collect samples during the first storm event of the Wet Season over the past three years, in violation of Section B(15) and B(5)(a) of the Storm Water Permit.

265.   Waterkeeper is informed and believes, and thereon alleges, that American Dismantling has failed to conduct visual observations of storm water discharges from all discharge points from one storm event per month in violation of Section B(4) of the Storm Water Permit.

266.   Waterkeeper is informed and believes, and thereon alleges, that American Dismantling has failed to document the presence of any floating or suspended material, O&G, discolorations, turbidity, odor, or the source of any pollutants, in violation of Section B(4) of the Storm Water Permit.

267.   Waterkeeper is informed and believes, and thereon alleges, that American Dismantling has failed and continue to fail to adequately revise the M&RP for the American Dismantling facility as necessary to ensure compliance with the Storm Water Permit, in violation of Sections A(9) and A(10) of the Storm Water Permit.

**I.     Failure to Comply with the Storm Water Permit's Reporting Requirements**

### i.     *All Toyot Auto Dismantling*

268.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot has failed to submit Annual Reports that comply with Section B(14) of the Storm Water Permit.

269.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot's claims for its failures to collect storm water samples for four (4) annual consecutive periods since 2010 are erroneous, in violation of Section B(14) and Section C of the Storm Water Permit.

270.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot has failed to report qualifying discharges in its annual reports since 2010 in violation of Section B of the Storm Water Permit.

271.   Waterkeeper is informed and believes, and thereon alleges, All Toyot's certifications of compliance with the Storm Water Permit in each of its past four (4) Annual Reports were erroneous because All Toyot has not developed and/or implemented the required BMPs, as required by Sections A and B of the Storm Water Permit.

Waterkeeper is informed and believes, and thereon alleges, that All Toyot's certifications of compliance with the Storm Water Permit in each of its past four (4) Annual Reports were erroneous because All Toyot has not revised the SWPPP, as required by Sections A and B of the Storm Water Permit.

272.   Waterkeeper is informed and believes, and thereon alleges, All Toyot's certifications of compliance with the Storm Water Permit in each of its past four (4) Annual Reports were erroneous because All Toyot has not revised the M&RP, as required by Sections A and B of the Storm Water Permit.

273.   Waterkeeper is informed and believes, and thereon alleges, All Toyot has failed and continues to fail to submit Annual Reports that contain explanations of All Toyot's failure to implement activities required by the Storm Water Permit, as required by Section B(14) of the Storm Water Permit.

274.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot failed to submit accurate Annual Reports, in violation of Sections C(9) and C(10) of the Storm Water Permit.

275.   Waterkeeper is informed and believes, and thereon alleges, that All Toyot failed to submit complete Annual Reports, in violation of Section B of the Storm Water Permit.

276.   Waterkeeper is informed and believes, and thereon alleges, All Toyot has failed and continues to fail to submit required reports when storm water discharges from the All Toyot facility exceed the Storm Water Permit Receiving Water Limitations identifying what additional BMPs will be implemented to achieve WQS, in violation of Receiving Water Limitations C(3) and C(4) of the Storm Water Permit.

### ii.   *Empire Auto Dismantling*

277.   Waterkeeper is informed and believes, and thereon alleges, that Empire has failed to submit Annual Reports that comply with Section B(14) of the Storm Water Permit.

278.   Waterkeeper is informed and believes, and thereon alleges, Empire failed to submit an Annual Report by July 1, 2010 to the Executive Officer of the Regional Water Board in violation of Section B(14) of the Storm Water Permit and was issued a Notice of Noncompliance by the California Regional Water Quality Control Board on July 25, 2010.

279.   Waterkeeper is informed and believes, and thereon alleges, that Empire failed to give a reason for not collecting storm water samples in its 2013-2014 Annual Report, as required by Section B(14) of the Storm Water Permit.

280.   Waterkeeper is informed and believes, and thereon alleges, that Empire has failed to report qualifying discharges in its Annual Reports in violation of Section B of the Storm Water Permit.

281.   Waterkeeper is informed and believes, and thereon alleges, that Empire's claims for its failures to collect storm water samples in its Annual Reports since 2010 are erroneous, in violation of Section B(14) and Section C of the Storm Water Permit.

282.   Waterkeeper is informed and believes, and thereon alleges, that Empire has failed to report qualifying discharges in its Annual Reports since 2010 in violation of Section B of the Storm Water Permit.

283.   Waterkeeper is informed and believes, and thereon alleges, Empire's certifications of compliance with the Storm Water Permit in each of its past four (4) Annual Reports were erroneous because Empire has not developed and/or implemented the required BMPs, as required by Sections A and B of the Storm Water Permit.

Waterkeeper is informed and believes, and thereon alleges, that Empire's certifications of compliance with the Storm Water Permit in each of its past four (4) Annual Reports were erroneous because Empire has not revised the SWPPP, as required by Sections A and B of the Storm Water Permit.

284.   Waterkeeper is informed and believes, and thereon alleges, Empire's certifications of compliance with the Storm Water Permit in each of its past four (4) Annual Reports were erroneous because Empire has not revised the M&RP, as required by Sections A and B of the Storm Water Permit.

285.   Waterkeeper is informed and believes, and thereon alleges, Empire has failed and continues to fail to submit Annual Reports that contain explanations of Empire's failure to implement activities required by the Storm Water Permit, as required by Section B(14) of the Storm Water Permit.

286.   Waterkeeper is informed and believes, and thereon alleges, that Empire failed to submit accurate Annual Reports, in violation of Sections C(9) and C(10) of the Storm Water Permit.

287.   Waterkeeper is informed and believes, and thereon alleges, that Empire failed to submit complete Annual Reports, in violation of Section B of the Storm Water Permit.

288.   Waterkeeper is informed and believes, and thereon alleges, Empire has failed and continues to fail to submit required reports when storm water discharges from the Empire facility exceed the Storm Water Permit Receiving Water Limitations identifying what additional BMPs will be implemented to achieve WQS, in violation of Receiving Water Limitations C(3) and C(4) of the Storm Water Permit.

### iii.   *American Dismantling*

289.   Waterkeeper is informed and believes, and thereon alleges, that American Dismantling has failed to submit Annual Reports that comply with Section B(14) of the Storm Water Permit.

290.   Waterkeeper is informed and believes, and thereon alleges, that American Dismantling failed to give a reason for not collecting storm water

samples in its 2013-2014 Annual Report, as required by Section B(14) of the Storm Water Permit.

291.   Waterkeeper is informed and believes, and thereon alleges, that American Dismantling has failed and continues to fail to report qualifying discharges in its Annual Reports in violation of Section B of the Storm Water Permit.

292.   Waterkeeper is informed and believes, and thereon alleges, that that American Dismantling's claims for its failures to collect storm water samples in its Annual Reports are erroneous, in violation of Section B(14) and Section C of the Storm Water Permit.

293.   Waterkeeper is informed and believes, and thereon alleges, that that American Dismantling has failed to report qualifying discharges in its Annual Reports since 2012 in violation of Section B of the Storm Water Permit.

294.   Waterkeeper is informed and believes, and thereon alleges, that American Dismantling's certifications of compliance with the Storm Water Permit in each of its two (2) Annual Reports were erroneous because that American Dismantling has not developed and/or implemented the required BMPs, as required by Sections A and B of the Storm Water Permit.

295.   Waterkeeper is informed and believes, and thereon alleges, that that American Dismantling's certifications of compliance with the Storm Water Permit in each of its past two (2) Annual Reports were erroneous because that American Dismantling has not revised the SWPPP, as required by Sections A and B of the Storm Water Permit.

296.    Waterkeeper is informed and believes, and thereon alleges, that American Dismantling's certifications of compliance with the Storm Water Permit in each of its past two (2) Annual Reports were erroneous because that American Dismantling has not revised the M&RP, as required by Sections A and B of the Storm Water Permit.

297.    Waterkeeper is informed and believes, and thereon alleges, that American Dismantling has failed and continues to fail to submit Annual Reports that contain explanations of that American Dismantling's failure to implement activities required by the Storm Water Permit, as required by Section B(14) of the Storm Water Permit.

298.    Waterkeeper is informed and believes, and thereon alleges, that that American Dismantling failed to submit accurate Annual Reports, in violation of Sections C(9) and C(10) of the Storm Water Permit.

299.    Waterkeeper is informed and believes, and thereon alleges, that that American Dismantling failed to submit complete Annual Reports, in violation of Section B of the Storm Water Permit.

300.    Waterkeeper is informed and believes, and thereon alleges, that American Dismantling has failed and continues to fail to submit required reports when storm water discharges from the that American Dismantling facility exceed the Storm Water Permit Receiving Water Limitations identifying what additional BMPs will be implemented to achieve WQS, in violation of Receiving Water Limitations C(3) and C(4) of the Storm Water Permit.

# VI. CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Effluent Limitations and the Clean Water Act

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

### (As Against All Toyot, Empire, and American Dismantling, "Operating Defendants")

301.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

302.   Waterkeeper is informed and believes, and thereon alleges, storm water containing levels of pollutants that do not achieve compliance with the BAT/BCT standards has discharged and continues to discharge from the Operating Defendants' facilities.

303.   Waterkeeper is informed and believes, and thereon alleges, that discharges of storm water containing levels of pollutants that do not achieve compliance with BAT/BCT standards from the Operating Defendants' facilities occur during every storm water discharge from the Operating Defendants' facilities.

304.   Waterkeeper is informed and believes, and thereon alleges, that the Operating Defendants' violations of Effluent Limitation B(3) of the Storm Water Permit and the CWA are ongoing and continuous.

305.   Waterkeeper is informed and believes, and thereon alleges, that the Operating Defendants will continue to be in violation of the Storm Water Permit

and the CWA each and every time contaminated storm water discharges from the Operating Defendants' facilities in violation of the Effluent Limitation B(3) of the Storm Water Permit.

306.   Waterkeeper is informed and believes, and thereon alleges, that each and every time the Operating Defendants discharge contaminated storm water from the Operating Defendants' facilities in violation of Effluent Limitation B(3) of the Storm Water Permit is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

307.   Waterkeeper is informed and believes, and thereon alleges, that by committing the acts and omissions alleged above, the Operating Defendants are subject to an assessment of civil penalties for each and every violation of the CWA pursuant to Section 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

308.   Waterkeeper is informed and believes, and thereon alleges, that an action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Waterkeeper and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

## SECOND CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Effluent Water Limitations and the Clean Water Act**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**
**(As against American Arrow)**

309.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

310.   A landowner can be held accountable for violations of the CWA that occur on its property if the landowner has knowledge of the activity and has some ability to control it.

311.   Waterkeeper is informed and believes, and thereon alleges, that because Waterkeeper's prior observations of the Property have revealed automobile parts stacked above the walls, unroofed and otherwise unshielded from rain, piled around the perimeter of the Property, and a hole in the wall of the 8569 Beech Ave. property, as well as a large rock placed in front of the hole to block storm water sample collection, American Arrow has constructive knowledge of unpermitted discharges from its tenants' facilities.

312.   Waterkeeper is informed and believes, and thereon alleges, that because American Arrow is also the owner of American Dismantling, American Arrow likely has direct knowledge of American Dismantling's storm water discharge.

313.   Waterkeeper is informed and believes, and thereon alleges, that American Arrow owns the Property on which the Operating Defendants' facilities

are located and from which the contaminated storm water was unlawfully discharged in violation of the CWA.

314.   Waterkeeper is informed and believes, and thereon alleges, that American Arrow was and is in a position to control the Operating Defendants' discharging activities because it has a lease arrangement with the Operating Defendants.

315.   Waterkeeper is informed and believes, and thereon alleges, that American Arrow is legally responsible, accountable, and liable for the Operating Defendants' unlawful discharge of contaminated storm water from the Operating Defendants' facilities and the Property in violation of the Storm Water Permit and the CWA.

## THIRD CAUSE OF ACTION

**Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Receiving Water Limitations and the Clean Water Act**

**33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f)**
**(As Against Operating Defendants)**

316.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

317.   Waterkeeper is informed and believes, and thereon alleges, that storm water containing levels of pollutants that adversely impact human health and/or the environment has discharged and continues to discharge from the Operating Defendants' facilities.

318.   Waterkeeper is informed and believes, and thereon alleges, that storm water containing levels of pollutants that adversely impact human health and/or the environment from the Operating Defendants' facilities occur during every storm water discharge from the Operating Defendants' facilities. Waterkeeper is informed and believes, and thereon alleges, that the Operating Defendants violate and will continue to be in violation of Receiving Water Limitation C(1) of the Storm Water Permit each and every time storm water containing levels of pollutants that adversely impact human health and/or the environment discharges from the Operating Defendants' facilities.

319.   Each and every violation of Receiving Water Limitation C(1) of the Storm Water Permit is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

320.   Waterkeeper is informed and believes, and thereon alleges, that storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards from the Operating Defendants' facilities occur during every storm water discharge from the facilities.

321.   The Operating Defendants violate Receiving Water Limitation C(2) of the Storm Water Permit each and every time storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards discharges from the Operating Defendants' facilities.

322.   Waterkeeper is informed and believes, and thereon alleges, that the Operating Defendants' violations of Receiving Water Limitation C(1) of the Storm Water Permit and the CWA from the facilities are ongoing.

323.    Waterkeeper is informed and believes, and thereon alleges, that the Operating Defendants' violations of Receiving Water Limitation C(2) of the Storm Water Permit and the CWA from the facilities are ongoing.

324.    The Operating Defendants' will continue to be in violation of the Storm Water Permit and the CWA each and every time contaminated storm water discharges from the facilities in violation of Receiving Water Limitation C(1) of the Storm Water Permit.

325.    The Operating Defendants' will continue to be in violation of the Storm Water Permit and the CWA each and every time contaminated storm water discharges from the facilities in violation of Receiving Water Limitation C(2) of the Storm Water Permit.

326.    Each and every violation of Receiving Water Limitation C(1) of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

327.    Each and every violation of Receiving Water Limitation C(2) of the Storm Water Permit is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

328.    By committing the acts and omissions alleged above, the Operating Defendants are subject to an assessment of civil penalties for each and every violation of the CWA pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

329.    An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above

would irreparably harm Waterkeeper and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

## FOURTH CAUSE OF ACTION

### Discharges of Contaminated Storm Water in Violation of the Storm Water Permit's Receiving Water Limitations and the Clean Water Act

### 33 U.S.C. §§ 1311(a), 1342, 1365(a), and 1365(f) (As Against American Arrow)

330.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

331.   A landowner can be held accountable for violations of the CWA that occur on its property if the landowner has knowledge of the activity and has some ability to control it.

332.   Waterkeeper is informed and believes, and thereon alleges, that because Waterkeeper's prior observations of the Property have revealed automobile parts stacked above the walls, unroofed and otherwise unshielded from rain, piled around the perimeter of the Property, and a hole in the wall of the 8569 Beech Ave. property, as well as a large rock placed in front of the hole to block storm water sample collection, American Arrow has constructive knowledge of unpermitted discharges from its tenants' facilities.

333.   Waterkeeper is informed and believes, and thereon alleges, that because American Arrow is also the owner of American Dismantling, American Arrow likely has direct knowledge of American Dismantling's storm water discharge.

334.   Waterkeeper is informed and believes, and thereon alleges, that American Arrow owns the Property on which the Operating Defendants' facilities are located and from which the contaminated storm water was unlawfully discharged in violation of the CWA.

335.   Waterkeeper is informed and believes, and thereon alleges, that American Arrow was and is in a position to control the Operating Defendants' discharging activities because it has a lease arrangement with the Operating Defendants.

336.   Waterkeeper is informed and believes, and thereon alleges, that American Arrow is legally responsible, accountable, and liable for the Operating Defendants' unlawful discharge of contaminated storm water from the Operating Defendants' facilities and the Property in violation of the Storm Water Permit and the CWA.

## FIFTH CAUSE OF ACTION

**Failure to Adequately Develop and/or Implement a Storm Water Pollution Prevention Plan in Violation of the Storm Water Permit and Clean Water Act**

**33 U.S.C. §§ 1311(A), 1342, 1365(a) and 1365(f)
(As Against Operating Defendants)**

337.   Waterkeeper incorporate the allegations contained in the above paragraphs as though fully set forth herein.

338.   Waterkeeper is informed and believes, and thereon alleges, that the Operating Defendants have failed and continue to fail to adequately develop a

SWPPP for the Operating Defendants' facilities, in violation of Section A and Provision E(2) of the Storm Water Permit.

339.   Waterkeeper is informed and believes, and thereon alleges, that the Operating Defendants have failed and continue to fail to adequately implement a SWPPP for the Operating Defendants' facilities, in violation of Section A and Provision E(2) of the Storm Water Permit.

340.   Waterkeeper is informed and believes, and thereon alleges, that the Operating Defendants have failed and continue to fail to adequately revise a SWPPP for the facilities, in violation of Sections A(9) and A(10) of the Storm Water Permit.

341.   The Operating Defendants have been in violation of Section A and Provision E(2) of the Storm Water Permit every day from April 16, 2010 to the present.

342.   The Operating Defendants' violations of Section A and Provision E(2) of the Storm Water Permit and the CWA at the Operating Defendants' facilities are ongoing and continuous.

343.   The Operating Defendants will continue to be in violation of Section A and Provision E(2) of the Storm Water Permit and the CWA each and every day the Operating Defendants fail to adequately develop and/or implement the SWPPP for the Operating Defendants' facilities.

344.   Each and every violation of the Storm Water Permit's SWPPP requirements at the Operating Defendants' facilities is a separate and distinct violation of the CWA.

345.   By committing the acts and omissions alleged above, the Operating Defendants are subject to an assessment of civil penalties for each and every violation of the CWA pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

346.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Waterkeeper and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

## SIXTH CAUSE OF ACTION

**Failure to Adequately Develop and/or Implement a Storm Water Pollution Prevention Plan in Violation of the Storm Water Permit and Clean Water Act**

**33 U.S.C. §§ 1311(A), 1342, 1365(a) and 1365(f)
(As Against American Arrow)**

347.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

348.   A landowner can be held accountable for violations of the CWA that occur on its property if the landowner has knowledge of the activity and has some ability to control it.

349.   Waterkeeper is informed and believes, and thereon alleges, that because Waterkeeper's prior observations of the Property have revealed automobile parts stacked above the walls, unroofed and otherwise unshielded from rain, piled around the perimeter of the Property, and a hole in the wall of the 8569 Beech Ave. property, as well as a large rock placed in front of the hole to block

storm water sample collection, American Arrow has constructive knowledge of unpermitted discharges from its tenants' facilities.

350.   Waterkeeper is informed and believes, and thereon alleges, that because American Arrow is also the owner of American Dismantling, American Arrow likely has direct knowledge of American Dismantling's storm water discharge.

351.   Waterkeeper is informed and believes, and thereon alleges, that American Arrow owns the Property on which Operating Defendants' facilities are located and from which the contaminated storm water was unlawfully discharged in violation of the CWA.

352.   Waterkeeper is informed and believes, and thereon alleges, that American Arrow was and is in a position to control the Operating Defendants' discharging activities because it has a lease arrangement with the Operating Defendants.

353.   Waterkeeper is informed and believes, and thereon alleges, that American Arrow is legally responsible, accountable, and liable for the Operating Defendants' failures to adequately develop and implement SWPPPs for the Operating Defendants' facilities in violation of the Storm Water Permit and the CWA.

## SEVENTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and/or Revise a Monitoring and Reporting Program in Violation of the Storm Water Permit and Clean Water Act**

**33 U.S.C. §§ 1311(A), 1342, 1365(a) and 1365(f)**
**(As Against Operating Defendants)**

354.   Waterkeeper incorporate the allegations contained in the above paragraphs as though fully set forth herein.

355.   Waterkeeper is informed and believes, and thereon alleges, that the Operating Defendants have failed and continue to fail to adequately develop a M&RP for the Operating Defendants' facilities in violation of Section B and Provision E(3) of the Storm Water Permit.

356.   Waterkeeper is informed and believes, and thereon alleges, that the Operating Defendants have failed and continue to fail to adequately implement a M&RP for the Operating Defendants' facilities in violation of Section B and Provision E(3) of the Storm Water Permit.

357.   Waterkeeper is informed and believes, and thereon alleges, that the Operating Defendants have failed and continue to fail to adequately revise a M&RP for the Operating Defendants' facilities in violation of Section A of the Storm Water Permit.

358.   The Operating Defendants have been in violation of Section B and Provision E(3) of the Storm Water Permit every day from April 16, 2010 to the present.

359.   The Operating Defendants' violations of Section B and Provision E(3) of the Storm Water Permit and the CWA at the Operating Defendants' facilities are ongoing and continuous.

360.   The Operating Defendants will continue to be in violation of Section B and Provision E(3) the Storm Water Permit and the CWA each and every day they fail to adequately develop and/or implement an M&RP for the Operating Defendants' facilities.

361.   Each and every violation of the Storm Water Permit's M&RP requirements at the Operating Defendants' facilities is a separate and distinct violation of the CWA.

362.   By committing the acts and omissions alleged above, the Operating Defendants are subject to an assessment of civil penalties for each and every violation of the CWA pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

363.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Waterkeeper and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

## EIGHTH CAUSE OF ACTION

**Failure to Adequately Develop, Implement, and/or Revise a Monitoring and Reporting Program in Violation of the Storm Water Permit and Clean Water Act**

**33 U.S.C. §§ 1311(A), 1342, 1365(a) and 1365(f)
(As Against American Arrow)**

364.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

365.   A landowner can be held accountable for violations of the CWA that occur on its property if the landowner has knowledge of the activity and has some ability to control it.

366.   Waterkeeper is informed and believes, and thereon alleges, that because Waterkeeper's prior observations of the Property have revealed automobile parts stacked above the walls, unroofed and otherwise unshielded from rain, piled around the perimeter of the Property, and a hole in the wall of the 8569 Beech Ave. property, as well as a large rock placed in front of the hole to block storm water sample collection, American Arrow has constructive knowledge of unpermitted discharges from its tenants' facilities.

367.   Waterkeeper is informed and believes, and thereon alleges, that because American Arrow is also the owner of American Dismantling, American Arrow likely has direct knowledge of American Dismantling's storm water discharge.

368.    Waterkeeper is informed and believes, and thereon alleges, that American Arrow owns the Property on which the Operating Defendants' facilities are located and from which the contaminated storm water was unlawfully discharged in violation of the CWA.

369.    Waterkeeper is informed and believes, and thereon alleges, that American Arrow was and is in a position to control the Operating Defendants' discharging activities because it has a lease arrangement with the Operating Defendants.

370.    Waterkeeper is informed and believes, and thereon alleges, that American Arrow is legally responsible, accountable, and liable for the Operating Defendants' failure to adequately develop implement, and/or revise a M&RP in violation of the Storm Water Permit and the CWA.

## NINTH CAUSE OF ACTION

**Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**
**(As Against Operating Defendants)**

371.    Waterkeeper incorporate the allegations contained in the above paragraphs as though fully set forth herein.

372.    Waterkeeper is informed and believes, and thereon alleges, that the Operating Defendants have failed and continue to fail to submit accurate Annual Reports to the Regional Board in violation of Sections C(9) and C(10) of the Storm Water Permit.

373.   Waterkeeper is informed and believes, and thereon alleges, that the Operating Defendants' Annual Reports have not met the monitoring and reporting requirements of the Storm Water Permit in violation of Section B(14) of the Storm Water Permit.

374.   Waterkeeper is informed and believes, and thereon alleges, that the Operating Defendants' Annual Reports were incorrect and/or did not include complete annual comprehensive site evaluations in violation of Sections A(9) and B(14) of the Storm Water Permit.

375.   Waterkeeper is informed and believes, and thereon alleges, that the Operating Defendants' Annual Reports were inaccurate and stated that they SWPPP's BMPs addressed existing potential pollutant sources when they did not, in violation of Storm Water Permit Section B.

376.   Waterkeeper is informed and believes, and thereon alleges, that the Operating Defendants' Annual Reports were false and stated the SWPPP was up to date when it was not, in violation of Section B of the Storm Water Permit.

377.   Waterkeeper is informed and believes, and thereon alleges, that the Operating Defendants' Annual Reports failed and continue to fail to provide the explanations required by the Annual Report when there is non-compliance with the Storm Water Permit's terms, in violation of Section B of the Storm Water Permit.

378.   Waterkeeper is informed and believes, and thereon alleges, that the Operating Defendants failed and continue to fail to submit written reports identifying what additional BMPs will be implemented to achieve WQS even

though the facilities discharges exceeded WQS, in violation of Receiving Water Limitations C(3) and C(4) of the Storm Water Permit.

379.   The Operating Defendants have been in violation of the reporting requirements of the Storm Water Permit each day the Operating Defendants' facilities have operated without reporting, as required by Section B(14) of the Storm Water Permit.

380.   The Operating Defendants' violations of the Reporting Requirements of the Storm Water Permit and the CWA are ongoing.

381.   The Operating Defendants have been in daily and continuous violation of Section B(14) of the Storm Water Permit every day since at least April 16, 2010.

382.   By committing the acts and omissions alleged above, the Operating Defendants are subject to an assessment of civil penalties for each and every violation of the CWA pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

383.   An action for injunctive relief under the CWA is authorized by 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Waterkeeper and the citizens of the State of California, for which harm Waterkeeper has no plain, speedy, or adequate remedy at law.

## TENTH CAUSE OF ACTION

**Failure to Report as Required by the Storm Water Permit in Violation of the Storm Water Permit and the Clean Water Act**

**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)
(As Against American Arrow)**

384.   Waterkeeper incorporates the allegations contained in the above paragraphs as though fully set forth herein.

385.   A landowner can be held accountable for violations of the CWA that occur on its property if the landowner has knowledge of the activity and has some ability to control it.

386.   Waterkeeper is informed and believes, and thereon alleges, that because Waterkeeper's prior observations of the Property have revealed automobile parts stacked above the walls, unroofed and otherwise unshielded from rain, piled around the perimeter of the Property, and a hole in the wall of the 8569 Beech Ave. property, as well as a large rock placed in front of the hole to block storm water sample collection, American Arrow has constructive knowledge of unpermitted discharges from its tenants' facilities.

387.   Waterkeeper is informed and believes, and thereon alleges, that because American Arrow is also the owner of American Dismantling, American Arrow likely has direct knowledge of American Dismantling's storm water discharge.

388.   Waterkeeper is informed and believes, and thereon alleges, that American Arrow owns the Property on which the Operating Defendants' facilities

are located and from which the contaminated storm water was unlawfully discharged in violation of the CWA.

389.   Waterkeeper is informed and believes, and thereon alleges, that American Arrow was and is in a position to control the Operating Defendants' discharging activities because it has a lease arrangement with the Operating Defendants.

390.   Waterkeeper is informed and believes, and thereon alleges, that American Arrow is legally responsible, accountable, and liable for the Operating Defendants' failure to report as required by the Storm Water Permit in violation of the Storm Water Permit and the CWA.

## VII.   **RELIEF REQUESTED**

391.   WHEREFORE, Waterkeeper respectfully requests that this Court:

a.   Declare that the Defendants have violated and continue to be in violation of the Storm Water Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a), for their discharges of pollutants not in compliance with the Storm Water Permit and violations of the substantive and procedural requirements of the Storm Water Permit;

b.   Enjoin Defendants from violating the substantive and procedural requirements of the Storm Water Permit and the Clean Water Act;

c.   Enjoin the Defendants from discharging pollutants not in compliance with an NPDES permit;

d.      Assess civil monetary penalties for each violation of the CWA on and after January 12, 2009 at $37,500 per day per violation pursuant to 33 U.S.C. § 1319(d) and 40 C.F.R. § 19.4;

e.      Award Plaintiffs their reasonable costs and fees, including attorney, witness, expert, and consultant fees, as permitted by section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

f.      Grant such further and additional relief as the Court deems just and proper.

Dated: 23 June 2015                     Respectfully submitted,

                                        /s/ Michael Robinson-Dorn

                                        Michael Robinson-Dorn (CA Bar 159507)
                                        UC Irvine School of Law
                                        Environmental Law Clinic
                                        401 E. Peltason Dr.
                                        P.O. Box 5479
                                        Irvine, CA 92612-5479
                                        (949) 824-1043
                                        mrobinson-dorn@law.uci.edu

                                        *Attorney for Plaintiffs*
                                        Inland Empire Waterkeeper and Orange
                                        County Coastkeeper

**Required Agency Service**

**Via U.S. Certified Mail**

U.S. Attorney General
U.S. Department of Justice
Room B-103
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Jared Blumenfeld
Regional Administrator
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, California 94105

United States Attorney's Office
Central District of California
312 North Spring Street
Suite 1200
Los Angeles, California 90012

Gina McCarthy
Administrator
U.S. Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Thomas Howard
Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, California 95812

Kurt Berchtold
Executive Officer
Santa Ana Regional Water Quality Control
Board
3737 Main Street, Suite 500
Riverside, California 92501